# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00691-CV

**The Cities of Allen, Argyle, Arlington, Bedford, Brownwood, Burkburnett, Burleson, Caddo Mills, Canyon, Carrollton, Cedar Hill, Clyde, College Station, Corral City, Crandall, Dimmitt, Eastland, Everman, Farmers Branch, Fate, Friona, Frisco, Grapevine, Haltom City, Harker Heights, Hereford, Highland Park, Honey Grove, Hurst, Irving, Kaufman, Keene, Keller, Killeen, Lake Worth, Lancaster, Lewisville, Mansfield, Midlothian, Parker, Ponder, Red Oak, Snyder, Stamford, Sulphur Springs, The Colony, Tyler, Wellman, Westlake and Wylie, Texas; and the City of Longview, Appellants**

**v.**

**Railroad Commission of Texas; CenterPoint Energy Resources Corporation; Atmos Energy Corporation; and Texas Gas Services Company, a Division of Oneok, Inc., Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT NO. D-1-GV-05-005221, HONORABLE GISELA D. TRIANA-DOYAL, JUDGE PRESIDING

## O P I N I O N

Fifty-one Texas cities[1] (collectively, "the Cities") brought a declaratory-judgment

action against the Railroad Commission ("the Commission"), challenging the validity of

---

[1] The cities of Allen, Argyle, Arlington, Bedford, Brownwood, Burkburnett, Burleson, Caddo Mills, Canyon, Carrollton, Cedar Hill, Clyde, College Station, Corral City, Crandall, Dimmitt, Eastland, Everman, Farmers Branch, Fate, Friona, Frisco, Grapevine, Haltom City, Harker Heights, Hereford, Highland Park, Honey Grove, Hurst, Irving, Kaufman, Keene, Keller, Killeen, Lake Worth, Lancaster, Lewisville, Mansfield, Midlothian, Parker, Ponder, Red Oak, Snyder, Stamford, Sulphur Springs, The Colony, Tyler, Wellman, Westlake and Wylie, Texas, and the City of Longview. The municipal plaintiffs, other than the City of Longview, participated in the underlying litigation as a coalition of cities, referring to themselves as "the Cities of Allen, et al." The City of Longview acted as a separate party and filed a separate notice of appeal.

Commission Rule 7.7101. *See* 16 Tex. Admin. Code § 7.7101 (2009) (Tex. R.R. Comm'n, Interim Rate Adjustments); *see also* Tex. Gov't Code Ann. § 2001.038 (West 2008) (allowing parties to challenge validity of agency rule by declaratory-judgment action). CenterPoint Energy Resources Corporation ("CenterPoint"), Atmos Energy Corporation ("Atmos"), and Texas Gas Services Company ("Texas Gas") intervened in support of the validity of the Commission's rule. The trial court issued a final judgment denying the Cities' request for declaratory relief, but issued findings of fact and conclusions of law stating that certain subsections of the Commission's rule were void. We affirm the judgment of the trial court.

**BACKGROUND**

In 2003, the Texas Legislature amended the Gas Utility Regulatory Act, Tex. Util. Code Ann. §§ 101.001-105.051 (West 2007 & Supp. 2009), to allow gas utilities an opportunity to recover a return on capital expenditures made during the interim period between rate cases filed pursuant to subchapter C of chapter 104 of the utilities code. *See* Act of May 16, 2003, 78th Leg., R.S., ch. 938, § 1, 2003 Tex. Gen. Laws 2801 (codified at Tex. Util. Code Ann. § 104.301); *see also* Tex. Util. Code Ann. §§ 104.101-.112 (West 2007) (setting forth procedures allowing regulated utilities to seek approval to change rates, referred to by parties as subchapter C rate cases). Under section 104.301, a gas utility may file a tariff or rate schedule providing for an interim rate adjustment with the applicable regulatory authority within two years of the utility's last subchapter C rate case. *See* Tex. Util. Code Ann. § 104.301(a) (West 2007).[2] The parties refer to

---

[2] Under the Gas Utility Regulatory Act, Texas municipalities share responsibility for regulating the State's gas utility rates with the Commission. *See* Tex. Util. Code Ann. §§ 102.001, 103.001 (West 2007). While municipalities may elect to delegate their regulatory responsibilities

2

section 104.301 as the "GRIP statute," with GRIP being an acronym for "Gas Reliability Infrastructure Program."[3]

The GRIP statute provides, in relevant part:

> A gas utility that has filed a rate case under Subchapter C within the preceding two years may file with the regulatory authority a tariff or rate schedule that provides for an interim adjustment in the utility's monthly customer charge or initial block rate to recover the cost of changes in the investment in service for gas utility services.

*Id.* This tariff or rate schedule must be filed at least 60 days before the proposed implementation date of the new rates. *Id.* During this 60-day period, the municipality may suspend implementation of the new rates for up to 45 days. *Id.* The amount of the interim rate adjustment allowed under the GRIP statute is based on values associated with the utility's return on investment, depreciation expenses, ad valorem taxes, revenue-related taxes, and incremental federal income taxes. *Id.* § 104.301(d).

The GRIP statute indicates that the reasonableness and prudence of the investments in service recovered by an interim rate adjustment will be subject to review in the utility's next subchapter C rate case. *See id.* § 104.301(a). Specifically, the statute provides that once a final order has been issued in a subchapter C rate case filed after the implementation of an interim rate adjustment, any change in investment that was included in the interim adjustment is "no longer subject to subsequent review for reasonableness or prudence." *Id.* Importantly, the statute also

---

to the Commission, *see id.* § 103.003 (West 2007), the Cities have not done so, and remain responsible for regulating utility rates within their boundaries.

[3] While the phrase "Gas Reliability Infrastructure Program" and the acronym "GRIP" do not appear in the applicable statutes or administrative rules, for purposes of this opinion we will adopt the terminology used by the parties and refer to section 104.301(a) as the "GRIP statute."

provides that until the issuance of a final order in the utility's next rate case, "all amounts collected under the tariff or rate schedule before the filing of the rate case are subject to refund." *Id.* Any utility that implements an interim rate adjustment is required to file a subchapter C rate case no later than 180 days after the fifth anniversary of the date its interim rate became effective. *Id.* § 104.301(h). Alternatively, the regulatory authority itself may instigate a rate case at any time to review the reasonableness of the utility's rates. *Id.* § 104.301(i); *see also id.* § 104.151 (West 2007).

In response to the GRIP statute, the Commission adopted Rule 7.7101, referred to by the parties as the "GRIP rule." *See* 16 Tex. Admin. Code § 7.7101. The GRIP rule, which sets forth the substantive and procedural requirements for obtaining an interim rate adjustment, provides that the director of the Commission may reject any GRIP application that "does not substantially comply with the requirements of this section." *See id.* § 7.7101(a).[4] The rule goes on to describe the required contents of a GRIP application, including an annual project report and an annual earnings monitoring report, and provides the methodology to be used in calculating the interim rate adjustment. *Id.* § 7.7101(c), (f). Consistent with the GRIP statute, the rule provides that during the utility's next rate case, the factors used to calculate the interim rate adjustment "shall be fully subject to review for reasonableness and prudence," *id.* § 7.7101(j), and until the rate case has been concluded, all amounts collected under the adjusted rate schedule are subject to refund. *Id.* § 7.7101(i).

---

[4] The word "application" does not actually appear in the GRIP statute, but appears only in the GRIP rule and in some of the parties' briefs to describe the filing of an interim tariff or rate schedule. Our use of the word "application" in this context should not be construed to imply that a substantive review of a utility's GRIP filing is required.

The GRIP rule also describes the procedure for reviewing a utility's GRIP filing, stating that the director of the Commission is required to ensure that such filings are reviewed for compliance with the GRIP statute and rule. *Id.* § 7.7101(g). Upon completion of the review, the director's recommendation regarding approval or rejection of the filing is submitted to the Commission for decision. *Id.* The GRIP rule does not provide for an adjudicatory hearing before the Commission on contested matters related to the GRIP filing, nor does it specifically provide for any involvement from the municipality having jurisdiction over the utility's rates.

After the GRIP statute and rule were adopted, certain utilities filed applications for interim rate adjustments with the Cities. The Cities denied the applications, and the utilities appealed to the Commission. The Cities then requested adjudicative hearings at the Commission on issues related to the applications, but the Commission refused, taking the position that the GRIP statute and rule did not provide for any such hearing. The Commission ultimately granted the utilities' applications for interim rate adjustments.

The Cities filed a declaratory-judgment action, seeking a declaration that the GRIP rule is void to the extent it prohibits them from intervening and obtaining an evidentiary hearing on appeals to the Commission from denials of GRIP filings. CenterPoint, Atmos, and Texas Gas intervened in support of the GRIP rule. The trial court concluded that the Cities were not entitled to the declaratory relief sought, and issued a take-nothing judgment. The trial court also issued findings of fact and conclusions of law, stating that the Cities have no authority to deny a utility's GRIP application unless it fails to comply with the statute and that utilities have no right to appeal a City's improper denial of a GRIP application to the Commission. In other words, the trial court's

5

conclusions of law suggest that the Cities are limited to conducting a ministerial review of GRIP applications, but in the event that the Cities do deny an application for failure to comply with the statute, no appeal may be taken to the Commission.[5]  Needless to say, if no appeal to the Commission is available, then the Cities have no right to intervene and participate in an adjudicative hearing at the Commission.

On appeal, the Cities argue that the trial court erred in denying its requested declaratory relief because the Commission exceeded its authority in adopting the GRIP rule and denying municipalities the opportunity for an adjudicatory hearing on contested matters related to GRIP applications.[6]  The Cities take the position that the Commission may conduct an appellate review of municipal denials of GRIP applications, but that the Commission must also allow the

---

[5]  The trial court also concluded that the Commission exceeded its authority by enacting subsections (g)(2)(B) and (g)(2)(C) of the GRIP rule, which allow the director to recommend denial or partial denial of a utility's GRIP application, and that those provisions are therefore void.  *See* 16 Tex. Admin. Code § 7.7101(g)(2)(B), (C) (2009) (Tex. R.R. Comm'n, Interim Rate Adjustments). The trial court further concluded that the Commission "does not have the authority to apply its Rule 7.7101 to the action of a city."  Presumably, this means that when a municipality is the appropriate regulatory authority with which to file a GRIP tariff or rate schedule, Rule 7.7101 does not apply and no additional action by the Commission is contemplated or authorized.

[6]  We reject the contention, raised by CenterPoint and Texas Gas, that the City of Longview is precluded from challenging the trial court's judgment under the "invited error" doctrine.  While the City of Longview requested in the trial court that the validity of the GRIP rule be resolved in the separate suits for judicial review of the Commission's final orders on the individual GRIP applications, this request does not rise to the level of invited error.  *See In re Department of Family & Protective Servs.*, 273 S.W.3d 637, 646 (Tex. 2009) (stating that invited error doctrine applies to situations where party requests court to make specific ruling, then complains of that ruling on appeal).  The City of Longview did not request the ruling that it now complains of on appeal—that the Cities are not entitled to an adjudicative hearing at the Commission on contested issues related to GRIP filings.  We do, however, decline to reach the City of Longview's appellate arguments to the extent they relate specifically to the GRIP filing of Atmos, as those complaints are not properly before us in a rule challenge under government code section 2001.038.  *See* Tex. Gov. Code Ann. § 2001.038 (West 2008).

6

affected municipality to intervene and obtain an evidentiary hearing on contested issues relating to the application.

CenterPoint, Atmos, and Texas Gas argue that the trial court was correct in determining that the Cities are not entitled to an adjudicatory hearing in appeals to the Commission from denials of GRIP applications. They contend, however, that the Commission does have appellate authority over a municipality's denial of a GRIP application, that the portions of the GRIP rule allowing the director to recommend denial or partial denial of an application are valid, and that the GRIP rule is applicable even when the regulatory authority is a municipality.

Finally, the Commission takes the position that the trial court was correct in concluding that appellate review—and by extension, an adjudicative hearing—is not available in connection with a municipality's denial of a GRIP application, and that the GRIP rule does not apply when the applicable regulatory authority is a municipality. The Commission argues, however, that the trial court erred in finding subsections g(2)(B) and g(2)(C) of the GRIP rule, allowing the director to recommend denial or partial denial of a GRIP application, to be void. The Commission asserts that if it has the authority to review a GRIP application for compliance with the statute, it must also have the authority to deny the application for failure to comply.

**STANDARD OF REVIEW**

This appeal turns solely on issues of statutory construction. Statutory construction is a matter of law, subject to de novo review. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008). "Construction of a statute by the administrative agency charged with its enforcement is entitled to serious consideration, so long as the construction is reasonable and does not contradict

7

the plain language of the statute." *Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d 820, 823 (Tex. 1993). We also give great weight to the agency's interpretation of its own rules and regulations, limiting our consideration to whether the interpretation is plainly erroneous or inconsistent with the plain language of the rule. *Public Util. Comm'n v. Gulf States Utils. Co.*, 809 S.W.2d 201, 207 (Tex. 1991).

## DISCUSSION

The primary question before us on appeal is whether the trial court erred in denying the Cities' request for a declaration that the Commission exceeded its authority in enacting a rule that precludes the Cities from intervening and obtaining an adjudicative hearing on appeals to the Commission from municipal denials of GRIP filings.

Although administrative rules are presumed valid, they may be found void if adopted without statutory authority. *Texas Dep't of Human Servs. v. Christian Care Ctrs, Inc.*, 826 S.W.2d 715, 720 (Tex. App.—Austin 1992, writ denied); *see also Brown v. Humble Oil & Ref. Co.*, 87 S.W.2d 1069, 1070 (Tex. 1935). "The determining factor in this and other decisions of our courts dealing with the question of whether or not a particular administrative agency has exceeded its rule-making powers is that the rule's provisions must be in harmony with the general objectives of the Act involved." *Gerst v. Oak Cliff Sav. & Loan Ass'n*, 432 S.W.2d 701, 706 (Tex. 1968). A rule may not impose additional burdens, conditions, or restrictions that are inconsistent with the statutory provisions. *Hollywood Calling v. Public Util. Comm'n*, 805 S.W.2d 618, 620 (Tex. App.—Austin 1991, no writ).

8

Here, the Cities argue that the Commission exceeded its statutory authority in adopting the GRIP rule because it is contrary to provisions of the Gas Utility Regulatory Act allowing for hearings in contested case proceedings. *See* Tex. Util. Code Ann. § 102.006(a) ("The [Commission] by rule shall provide for administrative hearings in contested cases to be conducted . . . ."). The Commission counters that the review of a GRIP filing is simply a ministerial review for compliance with the statute, that this review does not represent a contested case proceeding, and that because the GRIP statute does not provide for an adjudicative hearing, no such hearing is available.

In interpreting the GRIP statute, the trial court issued the following findings of fact:

1. The Texas Legislature did not intend to provide for a substantive review of the interim adjustment tariffs and rate schedules filed by utilities pursuant to Section 104.301 of the Texas Utilities Code [the GRIP statute], except for a ministerial review of the compliance with basic requirements set forth in that section.

2. The intent of the Texas Legislature was that regulatory authorities, either cities or the Railroad Commission of Texas, could contest such utility findings in a rate case filed under Subchapter C of the Texas Utilities Code following the filing of an adjusted tariff and/or following the annual recalculation of the adjusted tariff required by Section 104.301.

We begin by noting that the trial court's findings of fact are better characterized as conclusions of law. A trial court's designation of items as findings of fact is not controlling on appeal. *See Ray v. Farmers' State Bank*, 576 S.W.2d 607, 608 n.1 (Tex. 1979); *Jensen v. Covington*, 234 S.W.3d 198, 205 (Tex. App.—Waco 2007, pet. denied). Because the task of ascertaining and giving effect to the legislature's intent is a component of statutory construction, a matter of law

9

subject to de novo review, we will treat the findings quoted above as conclusions of law, and review them as such. *See, e.g.*, *Dallas County Cmty. College Dist. v. Bolton*, 185 S.W.3d 868, 872 (Tex. 2005) ("Statutory construction is a matter of law, which we review de novo. Our primary objective when construing a statute is to ascertain and give effect to the Legislature's intent.") (citation omitted); *see also BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002) ("Appellate courts review a trial court's conclusions of law as a legal question.").[7]

We note also that if "the reviewing court determines a conclusion of law is erroneous, but the trial court rendered the proper judgment, the erroneous conclusion of law does not require reversal." *BMC Software*, 83 S.W.3d at 794; *see also In re J.J.L.-P.*, 256 S.W.3d 363, 376 (Tex. App.—San Antonio 2008, no pet.) (observing that erroneous conclusions of law need not prompt reversal if judgment can be sustained on any legal theory supported by evidence). Therefore, if we determine that the trial court did not err in denying the Cities' request for declaratory relief, we will affirm the judgment, even if we conclude that one or more of the trial court's conclusions of law are erroneous.

*Legislative Intent in Enacting the GRIP Statute*

In finding that the Cities were not entitled to adjudicatory hearings at the Commission in connection with GRIP filings, the trial court concluded that the legislature intended to provide

---

[7] Based on our determination that the trial court's findings of fact are actually conclusions of law, we need not address the argument raised by the Commission, CenterPoint, and Texas Gas that because the Cities did not specifically challenge the sufficiency of the evidence to support the findings, they are binding for purposes of this appeal.

only a ministerial review of the filings until the utility's next rate case, at which time a thorough review for reasonableness and prudence would be performed.

To discern legislative intent, we look first to the statute's plain language. *Phillips v. Bramlett*, 288 S.W.3d 876, 880 (Tex. 2009). Under the plain language of the GRIP statute, a utility that has filed a rate case within the preceding two years "may file with the regulatory authority a tariff or rate schedule that provides for an interim adjustment in the utility's monthly customer charge or initial block rate to recover the cost of changes in the investment in service for gas utility services." Tex. Util. Code Ann. § 104.301(a). The statute further provides that in the 60 days before the adjusted rate goes into effect, the regulatory authority may suspend the implementation of the adjusted rate for a period of up to 45 days. *Id.* The statute does not, however, provide that the regulatory authority may deny the utility's application for an interim rate adjustment. As previously discussed, the statute also provides that the components of the interim rate calculation are subject to a reasonableness review during the utility's next rate case and that all amounts collected are subject to refund until the conclusion of the rate case, which must be filed no later than the 180th day after the fifth anniversary of the date on which the interim rates take effect. *Id.* § 104.301(a), (h).

Notably, the GRIP statute does not provide a mechanism for substantive review by the applicable regulatory authority at the time of the GRIP filing, nor does it provide for appellate review by the Commission. The Cities, however, urge that other provisions of the Gas Utility Regulatory Act, particularly the provision providing for administrative hearings in contested cases, should be read to apply to the GRIP statute as well. *See* Tex. Util. Code Ann. § 102.006(a). As the Cities accurately point out, legislative intent should be determined from the entire act, rather than

11

from isolated portions. *See Jones v. Fowler*, 696 S.W.2d 429, 432 (Tex. 1998). However, while it is true that section 102.006 provides for hearings in contested cases at the Commission, there is no indication that the legislature intended a utility's GRIP filing to constitute a contested case. In fact, the language in the GRIP statute providing for a reasonableness review and refund, if necessary, as part of the utility's next rate case indicates that the legislature intended to defer all substantive review of a utility's GRIP filing, including the resolution of contested issues, until the next rate case. *See* Tex. Util. Code Ann. § 104.301(a). Therefore, we do not find the existence of section 102.006 to be particularly persuasive in the present case.

When the plain language of a statute does not clearly convey the legislature's intent, we may rely on additional construction aids, such as the objective of the law, the legislative history, the consequences of a particular construction, the administrative construction of the statute, and its caption or preamble. *See* Tex. Gov't Code Ann. § 311.023 (West 2005); *Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 867-68 (Tex. 2009).

Senate Bill 1271, the bill that enacted the GRIP statute, bears the caption, "An act relating to incentives to encourage gas utilities to invest in new infrastructure." Act of May 16, 2003, 78th Leg., R.S., ch. 938, § 1, 2003 Tex. Gen. Laws 2801 (codified at Tex. Util. Code Ann. § 104.301). The House Bill Analysis states:

> Under their original jurisdiction, municipalities and the Railroad Commission regulate the rates of local distribution companies and pipelines, respectively. In setting rates, these regulators base those rates on the operating expenses of the utilities and a reasonable return on their investment in facilities. Rate [c]ases can cost $2-4 million to prosecute. If a utility makes an investment after it has prepared a rate case, it must wait until the next case to begin recovering on that investment. With continuing growth in Texas and recent emphasis on replacing facilities to

12

enhance safety, utilities face significant challenges in obtaining the capital necessary for these new investments. Under present law, this can only occur through a full rate case. This bill would permit the utility to begin recovery on new investments in the year following completion of construction. The bill provides monitoring mechanisms that would prevent utilities from earning more than allowed and would provide for periodic rate reviews.

House Comm. on Regulated Indus., Bill Analysis, Tex. S.B. 1271, 78th Leg., R.S. (2003).[8]

Similarly, the Senate Bill Analysis reads:

Currently, if a utility makes an investment after it has prepared a rate case, it must wait until the next case to begin recovering on that investment. However, utilities are facing some challenges in obtaining the necessary capital for new investments to meet the continuing growth in Texas and to replace facilities to enhance safety. S.B. 1271 permits utility companies to begin recovery on new investments in the year following completion of construction.

Senate Comm. on Natural Res., Bill Analysis, Tex. S.B. 1271, 78th Leg., R.S. (2003).

According to the House Research Organization, supporters of the bill asserted that "[t]his bill would streamline the regulatory process, allowing utilities to begin recovering their investments without lengthy and expensive rate cases. . . . By allowing a utility to begin recovering its investment immediately, the bill would create an incentive for investment in the state's gas pipeline infrastructure." House Research Organization, Bill Analysis, Tex. S.B. 1271, 78th Leg., R.S., 3-4 (May 16, 2003). Opponents of the bill, on the other hand, stated, "Rate regulation is based

---

[8] Presumably, the "monitoring mechanisms" and "periodic rate reviews" referenced in the bill analysis refer to ratepayer protections such as the annual recalculation of the interim rate adjustment, the reasonableness review and refund potential awaiting the utility in its next rate case, and the annual reports and earnings monitoring reports that the utility is required to file. *See* Tex. Util. Code Ann. § 104.301(a) (West 2007).

13

on a regulatory body's comprehensively reviewing a utility's costs and allowing the utility to earn a fair rate of return on its reasonable and necessary expenses. This bill would circumvent this process by allowing a utility to begin recovering for one rate component without full review of the utility's costs." *Id.* at 5. Both the statements of the bill's supporters and the complaints of the bill's opponents seem to acknowledge that the GRIP statute does not allow for a full, substantive review of the interim rate adjustments until the utility's next rate case.

Finally, the transcript of the hearing before the House Committee on Regulated Industries indicates that when the bill was initially introduced, there was some concern regarding the ability of the Cities to question the reasonableness of the interim rate adjustments under the GRIP statute.[9] At one point during the hearing, the committee chairman asked whether "there is some review by the city, for example, that can challenge whether or not that was reasonable or necessary or whatever the general words are that we use to look at the rate of return investments and things like that." Hearings on Tex. H.B. 1942 Before the House Comm. on Regulated Indus., 78th Leg., R.S. 14 (March 25, 2003). In response, Geoffrey Gay, representing a number of affected municipalities, testified, "My understanding . . . is that there is no prior approval in this bill that is a prospective type review from the Earnings Monitoring Reporting process. So my understanding would be a company comes in and files a tariff with a regulatory authority whether it be a city or the Railroad Commission. The tariff is automatically implemented a year later . . . ." *Id.* at 15.[10] When asked

_____

[9] The trial court admitted the transcript of this hearing into evidence. The hearing pertains to House Bill 1942, the companion bill to Senate Bill 1271.

[10] We note that Gay indicated on the record that he had not seen a copy of the committee substitute version of the bill until the day of the hearing, and when asked whether a rate adjustment would immediately go into effect at the time of filing, he stated, "It did under the original bill. I'll

14

how a utility's interim rate could be challenged, a representative from TXU responded that a "team of lawyers can come in and ask for a rate proceeding just like we do now" and the "interim rates would go into place subject to refund." *Id.* at 50. While the public hearing on House Bill 1942 suggests some legislative concern regarding the municipalities' participation in the GRIP process, the fact that the legislature passed the bill in the face of testimony regarding the lack of substantive review until the utility's next rate case suggests that these concerns were assuaged, possibly by the number of ratepayer protections included in the bill.

The aforementioned ratepayer protections further support the conclusion that the GRIP statute provides only for a ministerial review, with substantive issues to be deferred until the utility's next rate case. As previously discussed, all amounts collected under the interim rate adjustments are subject to refund until the conclusion of the utility's next rate case, which must be filed no later than the 180th day after the fifth anniversary of the effective date of the interim rates, and during which the interim rate calculations are subject to review for reasonableness and prudence. *See* Tex. Util. Code Ann. § 104.301(a). Furthermore, the amount of the adjustment "shall be recalculated on an annual basis in accordance with the [calculation methodology] requirements of Subsection (b)" of the statute. *Id.* § 104.301(c); *see also id.* § 104.301(b). Utilities seeking GRIP adjustments must file an annual report describing their investment projects completed and placed in service or retired or abandoned during the preceding calendar year, as well as an annual

---

try to conclude whether the substitute does that." Our quotation of Gay's testimony is not meant to imply that he conceded anything with respect to the implications of the GRIP statute, but merely to point out the legislature's awareness of the pertinent issues at the time it enacted the statute.

earnings monitoring report demonstrating their earnings during the preceding calendar year. *Id.* § 104.301(e), (f).[11]

Another ratepayer protection built into the GRIP process is the fact that a City is entitled to instigate the filing of a rate case at any time. *See id.* § 104.301(i) ("This section does not limit the power of a regulatory authority under Section 104.151."); *see also id.* § 104.151 (allowing regulatory authority to instigate rate case upon finding that utility's existing rates "are unreasonable or in violation of law"). Therefore, if the City determines that a utility's GRIP filings necessitate a review for reasonableness and prudence, the City is free to file a rate case, perform a thorough, substantive review of the components of the utility's GRIP filing, and if necessary, order a refund of amounts collected under the interim rate. *See id.* §§ 104.151, .301. Allowing a municipality to bring a substantive challenge to a utility's GRIP filing first in an appeal to the Commission and then a second time during the utility's next rate case is inconsistent with the legislature's intent to streamline the interim rate adjustment process in order to encourage gas utility infrastructure investment.

Finally, an agency's interpretation of a statute it is charged with enforcing is entitled to deference so long as the agency's interpretation is consistent with the language and purpose of the statute. *See TXU Elec. Co. v. Public Util. Comm'n*, 51 S.W.3d 275, 286 (Tex. 2001); *Tarrant Appraisal Dist.*, 845 S.W.2d at 823. Here, the Commission, the agency charged with enforcing the

---

[11] In addition, if the utility's earnings monitoring report indicates that it is earning a return on invested capital of more than 75 basis points above the return established under the rates it would be charging if not for the GRIP statute, the utility must file a statement with its report, giving the reasons why the rates are not unreasonable or in violation of law. Tex. Util. Code Ann. § 104.301(g).

Gas Utility Regulatory Act, interprets the statute to provide a streamlined process for utilities to qualify for interim rate adjustments, allowing for only a ministerial review of GRIP filings and precluding an adjudicative hearing at the Commission. In adopting the GRIP rule, the Commission stated:

> While it is clear that there will not be the kind of review of the reasonableness or prudence of an investment that is typically done in a full rate case, the statute does not clearly spell out the type of review that the Commission must conduct for investment that is the subject of a proposed interim rate adjustment. . . . The Commission finds that [] implementing a process for reviewing interim rate adjustment applications without a hearing is in harmony with other aspects of Texas Utilities Code, 104.301. The statute provides for no evidentiary proceedings, nor does it appear to contemplate that the regulatory authority should do more than review the utility's method of calculating the interim rate adjustment. The absence of due process requirements in [the GRIP statute] essentially means that all due process protections are deferred until the next full rate case, which must be filed no later than the fifth year.

29 Tex. Reg. 11951 (2004). Because this interpretation is not inconsistent with the language and purpose of the statute, it is entitled to deference. *See TXU Elec. Co.*, 51 S.W.3d at 286; *Tarrant Appraisal Dist.*, 845 S.W.2d at 823.

In light of the GRIP statute's legislative history, administrative construction, inherent ratepayer protections, and lack of express language providing for adjudicative hearings at the Commission, we conclude that the statute does not contemplate either adjudicative hearings or a substantive review at the time of the GRIP filing. Rather, the legislature intended to encourage investment in new infrastructure by creating a streamlined method of allowing utilities to immediately begin recovering on new investments without having to wait for the completion of a costly and time-consuming rate case. A ministerial review for compliance with the statute is all that

17

is required, as the Cities are entitled to a substantive review of the utility's GRIP filing during the utility's next rate case. On that basis, we hold that the trial court did not err in denying the Cities' request for declaratory relief.

*The Commission's Appellate Authority*

The Cities also contend that the trial court erred in issuing conclusion of law number four, which states, "A utility does not have the authority to appeal an improper denial of a filing by a City to the Railroad Commission under Section 104.301 of the Texas Utilities Code because the Legislature did not provide an appellate mechanism in that section." We note that the trial court *also* concluded—and we agree—that a municipality is not entitled to deny a utility's GRIP filing except for failure to comply with the GRIP statute. It would appear, then, that the only circumstance under which the Commission could even attempt to exercise appellate authority over a denial of a GRIP filing would be if a municipality concludes that a GRIP filing failed to comply with the statutory requirements. The result, if allowed, would essentially be a ministerial review of a ministerial review.

Significantly, despite having initially exercised appellate jurisdiction over municipal denials of GRIP filings, the Commission's position on appeal is that the trial court was correct in concluding that the Commission does not have appellate jurisdiction over a municipality's denial of a GRIP filing.[12] As previously stated, an agency's interpretation of a statute it is charged with enforcing is entitled to deference so long as the agency's interpretation is consistent with the

---

[12] The utilities, on the other hand, take the position that an appeal to the Commission is available.

language and purpose of the statute. *See TXU Elec. Co.*, 51 S.W.3d at 286. Because the statute does not expressly provide for appellate authority by the Commission over a municipality's denial of a GRIP filing, and because we have already determined that the legislature's intent in passing the GRIP statute was to provide a streamlined and efficient process for allowing interim rate adjustments, we conclude that the Commission's interpretation is consistent with the language and purpose of the statute. While the Commission generally exercises exclusive appellate jurisdiction to review orders of a municipality in the context of gas utility regulation, *see* Tex. Util. Code Ann. § 102.001(b) (West 2007), there is no indication that a municipality's denial of a GRIP filing for failure to comply with the statutory requirements is considered "an order or ordinance of a municipality" as contemplated by section 102.001. On that basis, we hold that appellate review by the Commission is not available when a municipality denies a GRIP filing after conducting a ministerial review for compliance with the statute.

*Subsections 7.7101(g)(2)(B) and (g)(2)(C) of the GRIP Rule*

Finally, the City of Longview argues that conclusion of law number one, which provides, "The Railroad Commission exceeded its statutory authority by enacting subsections 7.7101(g)(2)([B]) and (g)(2)([C]) of its Rule 7.7101 and those provisions are therefore void," is inconsistent with the trial court's judgment denying declaratory relief. Subsections 7.7101(g)(2)(B) and (g)(2)(C) allow the Commission to reject a GRIP filing in whole or in part. 16 Tex. Admin. Code § 7.7101(g)(2)(B), (g)(2)(C). While an erroneous conclusion of law need not mandate reversal if the trial court's judgment is otherwise correct, *see BMC Software*, 83 S.W.3d at 794, we note that in order to read the trial court's conclusions of law in a consistent manner, it is necessary to assume

19

that in some cases, the Commission *may* reject a GRIP filing in whole or in part if it fails a "ministerial review of the compliance with basic requirements set forth in" the GRIP statute, as described in finding of fact number one. In certain areas, it is the Commission, rather than any municipality, that exercises regulatory authority over gas utility rates. *See* Tex. Util. Code Ann. § 102.001(a) (Commission has exclusive jurisdiction over rates and services of utilities distributing gas either outside boundaries of municipality or inside municipality that surrenders jurisdiction to Commission). In that context, the Commission would have the same authority to review GRIP filings for compliance with the statute that the municipalities have for rates within their jurisdiction. It logically follows that subsections 7.7101(g)(2)(B) and (g)(2)(C) would only be void to the extent the Commission attempted to reject a GRIP filing over which it holds regulatory authority for any reason other than failure to comply with the statutory requirements.

*Cross-Points of Error*

CenterPoint and Texas Gas raise a cross-point that the trial court erred in issuing conclusion of law number five, which states, "The Railroad Commission does not have the authority to apply its Rule 7.7101 to the action of a city."[13] This point of error was raised only by appellees, none of whom filed a notice of appeal in this case. *See* Tex. R. App. P. 25.1(c) ("The appellate court may not grant a party who does not file a notice of appeal more favorable relief than did the trial court except for just cause."); *see also Helton v. Railroad Comm'n of Tex.*, 126 S.W.3d 111, 119-120

---

[13] CenterPoint and Texas Gas also raise cross-points that conclusions of law numbers one and four are erroneous, and the Commission raises its own cross-point that conclusion of law number one is incorrect. Because these points were also raised by the Cities, they have already been addressed.

(Tex. App.—Houston [1st Dist.] 2003, pet. denied) (observing that cross points seeking more relief than was granted in judgment require separate notice of appeal while cross points that merely present an alternative basis for affirming judgment do not). Because this cross-point does not merely present an alternative basis for affirming the judgment, but seeks a holding that the trial court erred in issuing one of its conclusions of law, we conclude that the cross-point is not properly before us in this appeal.

## CONCLUSION

We affirm the trial court's order denying the Cities' request for declaratory relief.

_____

Diane M. Henson, Justice

Before Chief Justice Law, Justices Puryear and Henson
    Chief Justice Law not participating[14]

Affirmed

Filed:   February 5, 2010

---

[14] Because Chief Justice Law was originally assigned to author this opinion, authoring duties were reassigned as of November 6, 2009.